54 CCPA

**Application of Klaus Heinz RISSE, Ulrich Horlein and Wolfgang Wirth.**

**Application of Ulrich HORLEIN, Wolfgang Wirth and Klaus Heinz Risse.**

**Patent Appeal Nos. 7574, 7677.**

United States Court of Customs and Patent Appeals.
June 15, 1967.

Burgess, Dinklage & Sprung, Arnold Sprung, New York City, for appellants.

Joseph Schimmel, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

These are consolidated appeals from decisions of the Patent Office Board of Appeals affirming the rejections of claim 9 of appellants' parent application serial No. 608,170, filed September 5, 1956, and claims 44 and 47 of continuation-in-part application serial No. 26,707, filed May 4, 1960, both entitled "Phenothiazine Derivatives."

The invention relates to novel acyl phenothiazines which possess excellent ganglion-blocking, hypotensive, potentiating and spasmolytic activity and are therapeutically useful as blood pressure reducing agents, sedatives, and antiemetics.

Claim 9 of the parent case is the broadest of the three claims on appeal and illustrates the structural formulae of the compounds:

9. A compound having the formula

in which R is a lower alkyl radical and Y is a lower alkylene radical.

Appellants acknowledge in their brief that claim 9 is directed to "substantially the same invention as that claimed in claim 44" of the continuation-in-part case and accordingly limit their arguments to claims 44 and 47 of the second application, relying upon the parent case only for support for the two latter claims, which read as follows:

44. A 3-acyl-10-(N'-methyl-piperazyl-N-lower alkylene)-phenothiazine in which said acyl is a member selected from the group consisting of propionyl and butyryl and said lower alkylene contains 2 to 3 carbon atoms.

47. 3-butyryl-10-(γ-N′-methylpiper-azyl-N-propyl)-phenothiazine.

The references relied upon are:

| | | |
|---|---|---|
| Robinson et al. | 2,590,125 | March 25, 1952 |
| Cusic | 2,650,919 | September 1, 1953 |
| Sherlock | 2,985,654 | May 23, 1961 |
| | | (filed Sept. 21, 1956) |
| Belgian Patent | 552,256 | November 14, 1956 |

Application of Schmitt (winning party of Interference No. 89,699 in which appellants conceded priority in parent case serial No. 608,170).

———◆———

The effective reference dates of Sherlock and the Belgian patent are subsequent to the September 5, 1956 filing date of appellants' parent case. Consequently, the first issue is whether the two claims of appellants' continuation-in-part case are entitled under 35 U.S.C. § 120 to the benefit of the filing date of their copending parent application, which in turn depends on whether the invention of claims 44 and 47 is sufficiently disclosed and described in the parent case in the manner required by 35 U.S.C. § 112, so as to enable an ordinarily skilled pharmaceutical chemist to make and use the claimed compounds.

With regard to this first issue, the board stated:

As the Examiner explains, appellants are not entitled to the date of their application *with respect to the claimed subject matter* of the present application since the parent application describes only one compound falling within the subgenus of claim 44 and, although it contains broad, inclusive terminology, provides no specific disclosure of the subgenus of claim 44 or the compound of claim 47. We cannot see that In re Grimme et al., 47 CCPA 785, 1960 C.D. 123, 754 O.G. 6, 274 F.(2d) 949, 124 USPQ 499, which appellants invoke, aids their cause. With respect to claim 44 the situation appears to be more nearly that of Watson v. Bersworth et al., 102 U.S.App. D.C. 187, 1958 C.D. 46, 727 O.G. 445, 251 F.(2d) [898] 986, 116 USPQ 87; In re Shokal et al., 44 CCPA 854, 1957 C.D. 234, 718 O.G. 445, 242 F.(2d) 771, 113 USPQ 283, or In re Fried, 50 CCPA 954, 1963 C.D. 248, 793 O.G. 7, 312 F.(2d) 930, 136 USPQ 429, since there is no definite support for the subgenus. * * * [Emphasis board's.]

We disagree wtih the board on this issue. The parent application not only contains a working example for one compound within the subgenus of claim 44, namely, the 3-propionyl-10-(b-N′-methyl-piperazyl-N-ethyl) phenothiazine disclosed (although misnamed) in example 8, but also contains the following generic disclosure which is inclusive of the subgenus of claim 44:

The novel phenothiazine derivatives in accordance with the invention have the general formula

in which Ac represents an acyl radical, such as a *lower, straight or branched chain alkyl acyl radical* having, for example, between 2 and 4 carbon atoms, or an aryl acyl radical, as, for example, the benzoyl radical; X and Y represent *hydrogen atoms* or lower molecular weight monovalent substituents, such as lower alkyl or alkoxy radicals or halogen atoms, as, for example,

methyl radicals or chlorine atoms; A represents a *lower straight or branched chain alkylene radical,* such as the methylene, *ethylene or propylene* radical; Z is a lower dialkylamino radical or a *heterocyclic* radical, such as a piperidino-, pyrrolidino-, morpholino- or *piperazino*-radical, which may possibly be *substituted.* [Emphasis ours.]

The emphasized portions of the above generic disclosure correspond to the subgenus of claim 44. The parent case also states that "the acyl radical is * * * preferably positioned at the 3-position" and that "when the X and Y represent hydrogen, the homocyclic rings are, of course, unsubstituted." The parent case also includes 27 working examples, among which are twelve directed to 3-propionyl phenothiazines within the generically disclosed invention, two directed to 3-butyryl compounds, eight in which the lower alkylene bridge (A or Y) is propylene (including five wherein the point of attachment to the terminal Z group is the γ-carbon and three for the 6-carbon), and five wherein the bridge between the 10- or N- position of the phenothiazine nucleus and the terminal Z group is ethylene.

In view of the circumstances of this particular case, we believe our *Grimme* decision, wherein one working example and broad generic disclosure was held to be adequate support under 35 U.S.C. § 112 for a claim to a subgenus not expressly and specifically disclosed as such, is more apposite than the cases cited by the board and is properly applicable here. We recognize that the examiner had indicated in the *Grimme* case that a generic claim to all the compounds would have been allowable in the parent case, if it had been presented, while such is not the case here. On the other hand, such a generic claim had not actually been allowed in Grimme's parent appli-

cation and the subgeneric claim which we held to be properly supported read on considerably more species [1] than claim 44 here, which the solicitor views as inclusive of only 18 specific acylphenothiazines.

The three cases cited by the board may readily be distinguished. Watson v. Bersworth, 102 U.S.App.D.C. 187, 251 F. 2d 898, represents a two to two split among judges of the District of Columbia courts on the issue of the sufficiency of generic disclosure in a parent application to support subgeneric claims in a continuation-in-part application. Two of the three opinions in the case, those of the trial judge, 159 F.Supp. 12, and the dissenting circuit judge, 251 F.2d at 901, disagree with the position of the Patent Office. Furthermore, the facts of the case as set forth in the dissenting circuit judge's opinion, the only one citing section 120, are quite different from those of the cases on appeal here, in that not one of the species embraced within the two subgeneric claims was specifically disclosed in the first (parent) case. The first specific disclosure of such subject matter was in an intermediate continuation-in-part application, identified as Case B in the dissent.[2]

The *Fried* decision cited by the board is similar to Watson v. Bersworth in that the parent case likewise did not specifically disclose a single compound within the scope of the claimed subgenus. In this respect, the court said:

* * * it is clear, as pointed out by the examiner, that there is no disclosure of a specific method of preparation of the specific compounds claimed here and, as pointed out by the Board of Appeals, that there is no disclosure of a specific working example for preparing one compound here claimed.[3]

The critical distinction is that in the *Fried* and Watson v. Bersworth cases,

---

1. The two variables in Grimme's subgeneric claim 1 on appeal were defined as follows: "$R_3$ is a radical containing not in excess of 10 carbon atoms and selected from the group consisting of hydrogen, alkyl, and phenylalkyl radicals; and A is a saturated aliphatic hydrocarbon radical having 2 to 5 carbon atoms." 274 F.2d at 950, 47 CCPA at 786.

2. 251 F.2d at 906.

3. 312 F.2d at 936, 50 CCPA at 963.

each of the applicants was attempting to claim a subgenus not specifically disclosed as such in the parent case, which contained only generic disclosure but no description of a single species within the scope of the later claimed subgenus. It is difficult to arrive at such a subgenus by a purely deductive approach, selecting appropriate variables from the generic disclosure.[4] On the other hand, one may more easily reach such a subgenus by proceeding toward it from two opposite directions, i. e., by an inductive approach from a specifically disclosed species within the subgenus, as well as the deductive approach from the generic disclosure. The latter situation is represented by the facts of this case as well as *Grimme*. In both cases the subgeneric claims of the continuation-in-part applications (1) are completely within the scope of the parent case generic disclosure and (2) read on at least one species disclosed in a working example of the parent application.

In the *Shokal* case cited by the board, we accepted an unchallenged statement by the examiner that the claimed genus read on literally thousands of species. Also, the appealed claims contained a negative limitation "free of elements other than carbon, hydrogen, or oxygen," which was not supported by the disclosure in appellants' parent case. In contrast, the appealed claims here recite only positive limitations; and subgeneric claim 44 reads on at most 18 species, including the compound of example 8 of the parent case and seventeen other structurally obvious position isomers and next adjacent higher homologues thereof. Under the circumstances of this case, we regard the numerous working examples in appellants' parent case *expressly* disclosing 3-propionyl- and 3-butyryl-10-(dialkylamino-alkyl) phenothiazines as *implicit* supporting disclosure, when taken

in combination with example 8, for the corresponding, prima facie equivalent[5] 3-propionyl- and 3-butyryl-10-(N′-methylpiperazyl-N-lower alkylene) phenothiazines of subgeneric claim 44.

◼ Consequently, we *reverse* the board's decision as to sufficiency of supporting disclosure in appellants' parent case for claim 44, and hold that the subgeneric claim is entitled under 35 U.S.C. § 120 to the benefit of the filing date of the parent application, which overcomes the rejection of claim 44 based on the Sherlock and Belgian patents.

◼ Although subgeneric claim 44 reads on a compound which is specifically described in a working example of appellants' parent case, the same cannot be said for claim 47. The latter claim defines one particular compound which is not disclosed in either the illustrative examples or anywhere else in the parent application. We therefore hold that claim 47 is not entitled to the benefit of the filing date of the parent case. See In re Honn, 364 F.2d 454, 53 CCPA 1469. Thus, the intervening Sherlock and Belgian references have not been overcome, and we *affirm* the prior art rejection of species claim 47 in view of these patents.

The second issue involves the availability as a "prior art" reference of the *application* of Schmitt, the winning party of interference No. 89,699, which also involved appellants' parent application serial No. 608,170. The board affirmed the examiner's rejection of claims 44 and 47 as unpatentable over the *application* of Schmitt in view of Cusic and Robinson et al. We stress the word "application" because the record before us permits us to conclude only that Schmitt's application is still pending in the Patent Office. There is no indication either that the ap-

4. Cf. our treatment of species claim 47, infra.

5. The board held that:
   * * * the Cusic and Robinson et al. patents demonstrate that in the phenothiazine art it would be the ordinary and expected thing for a skilled worker to consider the piperazino radical an appropriate substituent [substitute] for the terminal dialkylamino radical with a reasonable, but not absolutely certain, assurance that the substitution will result in a compound having similar, but not identical properties.

plication has become abandoned or that a patent has been granted thereon.

The Patent Office's position as to the availability of Schmitt's application as a reference is best summarized in the solicitor's brief as follows:

> Now that the interference is terminated in Schmitt's favor, and his complete disclosure is available prior art against appellants' claims, all parts of his disclosure stand on the same footing.

The manifest fallacy of this position, asserted also in Manual of Patent Examining Procedure section 1109.02, may be demonstrated by reference to the facts of record in this case. Both Schmitt and appellants are foreign inventors who filed their first patent applications abroad. Schmitt's application serial No. 575,005 was actually filed in this country March 30, 1956, and a priority date of June 30, 1955 for a counterpart French application was claimed pursuant to 35 U.S.C. § 119. Appellants' parent application was actually filed in this country September 5, 1956, after a German application was filed September 7, 1955, nearly one year earlier. Thus, each of Schmitt's foreign and actual United States filing dates is prior to the corresponding filing date of appellants, and we infer that this adverse position as to filing dates [6] was the basis for appellants' concession of priority as to the compound of the interference count, 3-acetyl - 10 - (γ - dimethylaminopropyl) - phenothiazine, also known as acetyl-promazine.

However, neither Schmitt's nor appellants' foreign applications are of record in this case. It may well be, for all we know, that Schmitt's French application contained only one example, directed to the species of the count of the interference, and that the remaining disclosure of Schmitt's United States application, which is of record, was new matter disclosed for the first time when Schmitt filed in this country, in which event Schmitt's American application would be entitled to the benefit of his French filing date only for the compound of the interference count. It may also be that appellants' United States parent and German applications are *substantially* identical, in which case their date of invention would be their German filing date of September 7, 1955, which precedes Schmitt's actual United States filing date of March 30, 1956 by nearly seven months.

The significance of the above is that the Patent Office tribunals are not, at least primarily, rejecting appellants' claims as unpatentable over the interference count, but rather are primarily rejecting them as unpatentable over a compound, not directly involved in the interference, which is common subject matter to both applications, namely, 3-propionyl - 10 - (γ - dimethylaminopropyl) - phenothiazine, further in view of the Cusic and Robinson patents. These secondary references establish, according to the board, the prima facie equivalency of dialkylamino and heterocyclic aliphatic amino (including (4 - methylpiperazino) radicals as terminal tertiaryamino groups connected to the 10 - or N - position of the phenothiazine nucleus by means of a lower alkylene bridge. This art-recognized equivalence is also acknowledged in appellants' parent application, wherein heterocyclic radicals and lower dialkylamino radicals are equated as terminal group Z in the generic structural formula.

■ We see no reasonable basis for a contention that an award or concession of priority necessarily makes the *complete* disclosure of the winning party's application available as prior art, either by itself or in combination with other art, against the losing party's application. As noted above, appellants' parent application may well be prior as to everything in Schmitt's United States applica-

---

6. Schmitt and appellants, all foreign inventors who made their inventions abroad, would be precluded by 35 U.S.C. § 104 from establishing their dates of invention by actual reduction to practice, and would be restricted to their effective filing dates for proving dates of invention, by constructive reductions to practice.

tion, except the count of the interference, as to which appellants conceded priority. We take note of the solicitor's reliance upon In re Gregg, 244 F.2d 316, 44 CCPA 904. However, in that case a patent had actually issued on the winning party's application, so that the *complete* disclosure of the *patent* was in fact available prior art under 35 U.S.C. §§ 102(e) and 103 as of the application filing date. See In re Taub, 348 F.2d 556, 52 CCPA 1675. In the present case, the record does not reveal that a patent has issued on the Schmitt application.

Although the *Gregg* case *holding* does not support the Patent Office position that the application disclosures of the winning party in an interference proceeding are available prior art under 35 U.S.C. §§ 102(g) and 103 against the losing party's claims, we must admit that there are decisions of this court from which that conclusion could be drawn. For example, this court held in In re Bicknell, 136 F.2d 1016, 1018, 30 CCPA 1250, 1253, that " * * * as far as appellants are concerned, the application of Jorgensen and that of Joeck [the winning interference parties] are prior art."

Also, in In re Boileau, 168 F.2d 753, 35 CCPA 1248, a patent had already issued on the winning interference party's application, but the filing date of the application was not early enough for the complete disclosure of the patent to be available as a reference under the rule of Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651, now codified as 35 U.S.C. § 102(e). Nevertheless, the court held the patent to be a proper prior art reference as to all subject matter commonly disclosed in both the patent and losing party Boileau's application, citing *Bicknell* as authoritative precedent. Rivise and Caesar, in Interference Law and Practice, Vol. IV, p. 2922 (1948), cite *Boileau* as exemplary of cases "which hold in effect that the application of the winning party constitutes prior art against the losing party and may be combined with other prior art to anticipate [render obvious] otherwise allowable claims in the losing party's application."

Thus there is some support in this court's decisions, prior to enactment of the Patent Act of 1952, for the Patent Office position that, at least insofar as commonly disclosed subject matter is concerned, the winning party's application is prior art under 35 U.S.C. §§ 102 (g) and 103 against the losing party's claims. Aside from the matter of case law support, however, we think the issue of whether the position is correct or not requires searching investigation.

Although the effect of section 102(e) is not a factor to consider in this case, unlike *Gregg*, supra, the Schmitt application disclosures may still be used against appellants' claims under the separate principles of (1) interference estoppel and (2) statutory prior art under 35 U.S.C. §§ 102(g) and 103. A good statement of the judicial doctrine of interference estoppel is found in the decision of this court in In re Yale, 347 F.2d 995, 1001, 52 CCPA 1668, 1674, wherein reference is made to:

> * * * the well established principle of estoppel that an interference settles not only the rights of the parties under the issues or counts of the interference but also settles every question of the rights to any claim which might have been presented and determined in the interference proceeding. [Cases cited.] * * * the doctrine of estoppel has been applied where a party has neglected or refused to contest priority of patentable subject matter which is *clearly* common to his application and the application of his opponent in interference [cases cited, emphasis in original] * * *.

■ Under the judicial doctrine of interference estoppel, it is clear that not all of the Schmitt application disclosures could be used against appellants' claims. Only those disclosures which are clearly common to both applications in interference could be so used. Since Schmitt does not disclose a single phenothiazine derivative of the *methylpiperazyl* type,

and the two appealed claims of appellant's continuation-in-part application are strictly limited to such compounds, it should be evident that appellants are not estopped to present and obtain these claims, which do not by any stretch of the imagination read on the application disclosures of Schmitt, their interference adversary.

■ Proceeding now to the matter of statutory prior art, we think it is well settled that prior art under 35 U.S.C. § 103 includes prior invention under 35 U.S.C. § 102(g). See, e. g., In re Yale, supra. Section 102(g) reads in pertinent part as follows:

> A person shall be entitled to a patent unless—
>
> \* \* \* \* \* \*
>
> (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it \* \* \*.

■ At a minimum, prior invention under section 102(g) includes the subject matter of the interference counts, which may be used as evidence of prior art under section 103. As this court stated in In re Cole, 82 F.2d 405, 409, 23 CCPA 1057, 1063:

> We therefore hold, in harmony with our decisions hereinbefore cited, that in order to warrant the allowance of the claims before us the claims must be inventively different from said interference counts; or, in other words, the specific details or limitations in the claims before us not found in said interference counts must, when combined with the structure embraced in said counts, involve [patentable] invention over said counts.

While it is clear that 35 U.S.C. § 102 (g) includes the subject matter of the interference counts, priority of invention as to which *was* actually determined adversely to the losing party, it is not clear whether or not section 102(g) includes the subject matter clearly common to the applications of both interference parties, but outside the scope of the interference counts, priority of invention as to which subject matter *might* have been determined in the interference proceeding. One thing is clear, however. If all commonly disclosed subject matter is treated as conclusive evidence of prior invention under section 102(g), then any distinction between the judicial doctrine of interference estoppel and the statutory prior art would be destroyed by confusion of the two separate matters, and any subject matter as to which an interference estoppel exists would automatically be regarded as available prior art under 35 U.S.C. § 103 against the losing party in an interference.

Upon review of prior decisions of this court, notably, *Bicknell* and *Boileau,* supra, we find that these two separate and distinct matters have often been confusingly interrelated. This confusion has been judicially criticized by the Court of Appeals for the District of Columbia Circuit in Ethyl Gasoline Corp. v. Coe, 78 U. S.App.D.C. 233, 139 F.2d 372, 373–374 (1943), which pointed out that "[t]he confusion, between an estoppel and the condition of the prior art, has been unfortunate and misleading."

Prior to enactment of the Patent Act of 1952, various commentators likewise recognized the existence of a judicial conflict concerning the nature and scope of the doctrine of interference estoppel, which bears on the issue with which we are presently concerned, namely whether the commonly disclosed subject matter, as to which a recognized estoppel exists, may be used as prior art under 35 U.S.C. § 103 against the losing party's claims. McCrady, in his book Patent Office Practice, Second Edition, 1946, pp. 161–3, comments as follows:

> Because the doctrine of interference estoppel as applied by the Court of Customs and Patent Appeals and the [Patent] Office is not based upon any definite provision of the statutes or upon any legal doctrine recognized in courts of general jurisdiction [including the Court of Appeals, D.C.], the scope of the doctrine, and the criteria

by which its occurrence is recognized, have varied considerably as succeeding decisions were rendered. \* \* \* The doctrine is peculiar to practice in the Patent Office, the Court of Customs and Patent Appeals, and (in modified form) the courts of the District of Columbia; it has never been recognized by other courts.

\*　\*　\*　\*　\*　\*

\* \* \* decisions [of the Court of Appeals for the District of Columbia] have applied the interference estoppel doctrine in a more restricted form than have the Patent Office and [this court]. \* \* \*

\*　\*　\*　\*　\*　\*

Conformably with the rule of bar by judgment, the District of Columbia courts hold that *no interference estoppel arises where the claims in question could not have been made counts of the existing interference* \* \* \*. On this point, the decisions of the District of Columbia courts are in conflict with those of the Court of Customs and Patent Appeals. [Emphasis ours.]

■ When Congress enacted the Patent Act of 1952, no resolution was made of this recognized judicial conflict in relation to the doctrine of interference estoppel. Paragraph (g) of 35 U.S.C. § 102 merely retains the rules of law governing the determination of priority of invention developed by judicial and administrative decisions in interference proceedings. Reviser's Note, 35 U.S.C.A. § 102(g); Federico, "Commentary on the New Patent Act," 35 U.S.C.A. p. 19 (1954). Since Congress did not choose to resolve the conflict by statute, this leaves the courts free to attempt harmonization of conflicting precedents, insofar as desired. We are persuaded to adopt the more liberal view of the Court of Appeals for the District of Columbia Circuit that interference estoppel and prior art are separate and distinct matters which should not be confused. The result is

adoption of the following position stated by McCrady, supra, p. 164:

But claims which the winning party could not make, for lack of disclosure, cannot be denied to the loser on the ground of interference estoppel, if they distinguish patentably from the counts. \* \* \*

■ The distinction which should be borne in mind is that, with regard to interference estoppel, the losing party is only estopped to obtain claims which read directly on disclosures of subject matter clearly common to both the winning party's application and that of the losing party; but that, with regard to prior art (including prior invention), the losing party cannot obtain claims to subject matter which is *either barred* under 35 U.S.C. § 102(g), or rendered *obvious* under 35 U.S.C. § 103, by the invention defined in the interference counts.

■ Applying these principles to the case at bar, we note that an interference estoppel exists as to the species of example 8 of the Schmitt application, 3-propionyl - N - γ - dimethylamino - propyl - phenothiazine, since this compound is also disclosed in examples 2, 18, and 27 of appellants' parent application. Although priority of invention as to this species was not actually determined in the interference, priority *might* have been so determined, since it represents commonly disclosed subject matter. Thus appellants are estopped to obtain a claim which reads directly on this dimethylamino. species, *regardless* of whether the compound is the prior invention of another, Schmitt, in terms of 35 U.S.C. § 102 (g). See Dirkes v. Eitzen, 103 F.2d 520, 26 CCPA 1198.

Appellants recognize the applicability of the doctrine of interference estoppel to that compound. None of their appealed claims, which Schmitt could not have made for lack of disclosure, reads on the compound of Schmitt's example 8, or any other phenothiazine derivative disclosed by Schmitt for that matter.[7]

---

7. Cf. United States Rubber Co. v. Coe, 79 U.S.App.D.C. 305, 146 F.2d 315, where-

in the Court of Appeals for the District of Columbia Circuit affirmed an interfer-

**958**

■ Although there *might* have been a determination as to priority of invention of the aforesaid species in the interference, there was in fact no such determination, and the Patent Office, on this record, cannot use this compound, which is outside the scope of the specific interference count, as evidence of prior art under 35 U.S.C. §§ 102(g) and 103.

■ The important thing which we stress here is that the mere fact that appellants are estopped by the interference to claim patentable subject matter which is clearly common to both their parent application and that of Schmitt, namely certain phenothiazine derivatives of the dialkylamino type, does not necessarily make such common disclosures of *one* subgeneric invention "prior art" under 35 U.S.C. §§ 102(g) and 103 as to a *different* subgeneric invention, namely the phenothiazine derivatives of the methylpiperazyl type which appellants now claim, even though both subgeneric inventions are embraced within the generic concept disclosed and claimed in appellants' parent application.

Under the circumstances, we think that the Patent Office may not properly use the dimethylamino species of example 8 of Schmitt as evidence of prior art against appellants' present claims, unless and until that compound becomes available statutory prior art, as for example by the issuance of a patent on the Schmitt application, which would make this species prior art as of Schmitt's application filing date in this country. 35 U.S.C. §§ 102(e), 103.

To the extent that the Patent Office secondarily relies on the species of the interference count, 3-acetyl-10-(γ-dimethylaminopropyl)-phenothiazine, priority of invention as to which was conceded to Schmitt by appellants, we think the Wirth affidavit of record is adequate to establish patentability of the presently claimed phenothiazine derivatives of the methylpiperazyl type over this dimethylamino species, which *is* admissible evidence of prior art under 35 U.S.C. §§ 102 (g) and 103. In re Yale, supra; Smith v. Watson, 95 U.S.App.D.C. 52, 218 F.2d 863, (D.C.Cir.1955).

The board has expressed three objections to this affidavit. One of these, that the properties compared were not disclosed in appellants' continuation-in-part application, is clearly erroneous and has been withdrawn by the solicitor's brief. A second objection, that the "prior art" compound tested by appellants, the 3-acetyl species of the interference count, is "obviously not the closest in structure to the compounds claimed," is not well taken since the 3-propionyl species commonly disclosed in both applications involved in the interference is not legally "prior art" as to appellants' claims on the record of this case, for reasons discussed in detail above.

The third objection to the Wirth affidavit, that the results differ only in degree but not in kind, is unfounded in our opinion. We disagree particularly with the examiner's view that the results proving two of the claimed compounds to possess a circulatory regulation capacity at least three to five times better than that of the 3-acetyl compound defined by the interference count show a "difference of degree only." There is no evidence of record showing that such improvement would have been expected by one of ordinary skill in this art. The claimed compounds might have been three to five times worse than the prior art compound. Instead, they are three to five times better. See In re Wagner, 371 F.2d 877, 54 CCPA ——.

■ Insofar as the *Bicknell* and *Boileau* cases, supra, hold that *"all"* commonly disclosed subject matter is "prior art" against the losing interference party's claims, those cases are expressly overruled, as they are inconsistent with the views expressed herein as to the entirely separate and distinct natures of the judicial doctrine of interference estoppel and the statutory prior art under

ence estoppel rejection since "* * * all the [appealed] claims are readable on the * * * application [of the winning interference party] * * *."

35 U.S.C. § 103, the latter including prior invention under 35 U.S.C. § 102(g). Although "all" subject matter which is clearly common to the applications of the winning and losing interference parties may be used for purposes of an interference estoppel rejection against the losing party's claims, the extent to which this commonly disclosed subject matter may be used as available evidence of the "prior art" under section 103 depends on whether the common subject matter relied on meets one or more of the paragraphs of 35 U.S.C. § 102. This, of course, will in turn depend on the facts and circumstances of a particular case. General rules, e. g. that "all" commonly disclosed subject matter is "prior art" against the losing party's claims, In re Boileau, supra, are to be neither trusted nor blindly applied in particular cases in which the facts may well differ materially from the controlling facts in precedents wherein such generalities are expressed.

For the reasons stated above, the decision of the board in PA 7574 is reversed as to the subgeneric claim 44 and affirmed as to species claim 47, and the appeal in PA 7677 is dismissed as moot.

MODIFIED

WORLEY, C. J., concurs in the result.

MARTIN, J., participated in the hearing of this case but died before a decision was reached.

SMITH, Judge (concurring).

The record shows that the Board of Appeals here consisted of an examiner-in-chief and two acting examiners-in-chief. Appellants do not challenge the legality of that board. For the reasons expressed in my dissenting opinion in In re Wiechert, 370 F.2d 927, 54 CCPA 957, the decision of such a board in my view is a legal nullity. However, I must accept the majority's view on this issue in the *Wiechert* case, i. e., the legality of the board is not an issue here. I therefore participate in the merits of this appeal and in so doing, agree with the conclusion of the majority.